UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARIANN PERNA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-11643-IT |
| | * | |
| JOSE F. MARTINEZ, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM ON DAMAGES

March 31, 2021

TALWANI, D.J.

The uncontested facts of this case are disturbing. In 2009, Plaintiff Mariann Perna was arrested and held in the custody of the Massachusetts Trial Court Department pending a court appearance. While she was in custody, a court officer, Defendant Jose Martinez, subjected her to sexual contact in a courthouse elevator and a holding cell. Plaintiff reported these assaults to the Strafford County House of Corrections and the New Hampshire Department of Corrections after being transferred into their custody. What resulted from those reports remains unclear, but what is uncontested is that Mr. Martinez continued to work as a court officer with the Massachusetts Trial Court Department. Five years later, Ms. Perna was again arrested and placed into Mr. Martinez's custody. Again, he assaulted her. A month later, it happened again.

Plaintiff brought this action alleging various causes of action under federal and state law. Mr. Martinez defaulted as to his liability. See Entry of Default [#104]. Thereafter, the court held an evidentiary hearing to ascertain Ms. Perna's damages. For the reasons set forth below, the

court concludes that Ms. Perna is entitled to general damages of $150,000, special damages of $53,521.45, and punitive damages of $500,000.

    I.   <u>Procedural Background</u>

Plaintiff filed her <u>Complaint</u> [#1] on August 31, 2017. The complaint named Mr. Martinez, the Massachusetts Trial Court Department, the Strafford County House of Corrections, and the New Hampshire Department of Corrections as Defendants and asserted eighteen claims arising under state and federal law. The court granted the Massachusetts Trial Court Department and the New Hampshire Department of Corrections' motions to dismiss on sovereign immunity grounds. <u>See</u> Order [#68]. Plaintiff dismissed her claims against Defendant Strafford County House of Corrections after they reached a settlement. Stipulation of Dismissal [#110].

In his *pro se* <u>Answer</u> [#14], Mr. Martinez denied that he had inappropriate contact with Plaintiff and asserted, as an affirmative defense, that he had been acquitted of charges of rape and sexual assault and battery.

On July 11, 2019, Plaintiff filed a <u>Motion to Compel</u> [#84]. In her motion, Plaintiff stated that Mr. Martinez had failed to appear at a deposition on June 13, 2019. Plaintiff also noted that correspondence subsequently served on Mr. Martinez had not been returned. On July 30, 2019, with no opposition filed, the Magistrate Judge granted the motion and compelled Mr. Martinez's appearance at the deposition. <u>See</u> Elec. Order [#86].

On October 3, 2019, Plaintiff moved for an entry of default against Mr. Martinez. <u>See</u> Pl.'s Mot. Entry Default [#94]. In her motion, Plaintiff noted that, after the court compelled Mr. Martinez's deposition, Plaintiff re-noticed the deposition for September 16, 2019, and served Mr. Martinez with the notice by first-class mail and personal service. <u>Id.</u> ¶¶ 7–8. However, Mr. Martinez again failed to appear. <u>Id.</u> ¶ 10. Mr. Martinez did not oppose the motion for entry of

default. On January 3, 2020, the Magistrate Judge ordered Mr. Martinez to show cause as to why the court should not enter default against him no later than January 30, 2020. Elec. Order [#99]. Mr. Martinez did not file a response to the order to show cause but did appear at the hearing on the Motion for Entry of Default. See Elec. Clerk's Notes [#101]. Following the hearing, the court reserved ruling on the Motion for Entry of Default pending Mr. Martinez's appearance at a February 12, 2020 deposition, and set another status conference for March 4, 2020. Id.

Mr. Martinez failed to appear at the March 4, 2020 status conference. See Elec. Clerk's Notes [#103]. At the conference, Plaintiff's counsel reported that Mr. Martinez had appeared at the February 12, 2020 deposition. Nonetheless, in light of Mr. Martinez's failure to oppose to the Motion for Entry of Default, his failure to show cause as to why default should not be entered against him, and his repeated failure to appear at proceedings, the Magistrate Judge allowed Plaintiff's Motion for Entry of Default [#94] pursuant to Fed. R. Civ. P. 55(a). Id.

Mr. Martinez never moved to set aside the entry of default pursuant to Fed. R. Civ. P. 55(c).

On April 1, 2020, the court held an initial pretrial conference at which Mr. Martinez appeared. See Elec. Clerk's Notes [#111]. Plaintiff sought to proceed to a jury trial as to damages and the court agreed to proceed in that manner.

On February 3, 2021, the court reconsidered putting the question of damages to a jury in light of the substantial backlog of criminal cases waiting on a jury trial during the ongoing pandemic. See Elec. Order [#117]. The court concluded that an evidentiary hearing on damages would be a better use of the court's limited resources and that the constitutional right to a jury did not survive entry of default. Id. Accordingly, the court set the matter for an evidentiary hearing on damages. See Procedural Order [#119].

On February 12, 2021, Plaintiff filed her Motion for Entry of Default Judgment [#123] pursuant to Fed. R. Civ. P. 55(b)(2). Plaintiff's Motion requests $150,000 in general damages; $146,650 in lost past wages; $884,000 in lost future earning capacity; $53,521.45 in medical expenses; and unspecified punitive damages. Defendant did not file an opposition. On February 22, 2021, Plaintiff filed a Motion to Amend [#126] her Motion for Entry of Default Judgment [#123] to add the request for punitive damages.[1] The court held the evidentiary hearing on damages on February 25, 2021.

       II.   Liability Based on Factual Allegations in the Complaint

As a result of the Entry of Default [#104] pursuant to Fed. R. Civ. P. 55(a), Defendant is deemed to have admitted all facts well-pleaded in the complaint as to the issue of Defendant's liability. See Sec. & Exch. Comm'n v. Tropikgadget FZE, 146 F. Supp. 3d 270, 275 (D. Mass. 2015) ("As to the issue of liability, the entry of default constitutes an admission of all facts well-pleaded in the complaint."). However, "liability does not automatically attach from the well-pleaded allegations of the complaint, as it remains the court's responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief." Rolls-Royce PLC v. Rolls-Royce USA, Inc., 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)). Accordingly, the court starts by assessing whether the allegations in the Complaint now deemed admitted provide a proper basis for liability on each of the asserted claims.

---

[1] At the evidentiary hearing, Defendant stated that he had no objection to Plaintiff's Motion to Amend, and the court allows amendment of Plaintiff's request nunc pro tunc.

### 1.  Facts Alleged in the Complaint

In or about July 2009, Mariann Perna was a detainee held in custody at the Lawrence

District Court in Lawrence, Massachusetts in connection with a scheduled court appearance for

pending criminal charges. Compl. ¶ 6 [#1]. Jose Martinez, who was a court officer with the

Massachusetts Trial Court Department, subjected Ms. Perna to two incidents of nonconsensual

sexual contact while she was in custody. Id. ¶¶ 2, 7. Namely, Mr. Martinez touched Ms. Perna's

buttocks while she was handcuffed and shackled in a courthouse elevator and, at another point,

touched Ms. Perna inappropriately and had nonconsensual sex with her while she was shackled

in a cell. Id. ¶ 7.

After the July 2009 incident, Ms. Perna was transported to the Strafford County Jail in

New Hampshire and reported the assault to Defendant Strafford County House of Corrections

and the New Hampshire Department of Corrections. Compl. ¶¶ 8–9 [#1]; Strafford Answer ¶ 9

[#70].

In September 2014 and October 2014, Ms. Perna was again twice detained at the

Lawrence District Court in connection with scheduled court appearances. Compl. ¶ 11 [#1].

During these two detentions, Mr. Martinez subjected her to three additional instances of

unwanted and nonconsensual sexual contact. Id. ¶¶ 11–14. The first two occurred during the

September 2014 detention. In the first of these, Ms. Perna was shackled in a cell when Mr.

Martinez groped her over her clothing by inserting his hands through the metal trap door of the

cell. Id. ¶ 12. In the second, Mr. Martinez had unwanted sexual contact with Ms. Perna in a

stationary elevator by kissing her, groping her, digitally entering her, exposing himself, and

unsuccessfully attempting to have intercourse with her. Id. During this incident, Mr. Martinez

also used his cellphone to take one or more pictures of Ms. Perna while she was partly

undressed. Id. Ms. Perna was shackled throughout this incident. Id. In the third contact, which occurred during the October 2014 detention, Mr. Martinez removed Ms. Perna from her cell still shackled, but without handcuffs, and brought her to an unoccupied area of the courthouse only accessible by employees. Id. ¶ 13. While there, Mr. Martinez kissed Ms. Perna, groped her beneath her clothing, exposed himself, and had nonconsensual sex with her. Id.

2. *Whether the Facts Deemed Admitted Establish Liability*

Claims One and Two are both brought pursuant to 42 U.S.C. § 1983 and allege a violation of the Eighth and Fourteenth Amendments to the federal Constitution, respectively. While Plaintiff asserts both provisions, the Supreme Court and the First Circuit have made plain that the Due Process Clause of the Fourteenth Amendment provides the correct framework for analyzing claims of abuse brought by pretrial detainees. See Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007) ("Because [plaintiff] was a pretrial detainee rather than a convicted inmate, the Fourteenth Amendment governs his claim."); see also Bell v. Wolfish, 441 U.S. 520, 537 (1979) (same). Nevertheless, the Eighth Amendment analysis remains relevant as there is substantially more case law on the Eighth Amendment question and courts have held that any protections provided under the Eighth Amendment to convicted inmates are also necessarily provided by the Due Process Clause of the Fourteenth Amendment to pretrial detainees. See City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983) ("[T]he due process rights of a person [detained before a formal adjudication of guilt] are at least as great as the Eighth Amendment protections available to a convicted prisoner"). Furthermore, the factual record here is unclear as to whether Plaintiff is properly considered to be a convicted inmate or a pretrial detainee during the relevant encounters.

Regardless as to how the question is framed, it is "beyond debate" that the Eighth

Amendment (and, by extension, the Fourteenth Amendment) establishes an inmate's right to be

free from sexual abuse at the hands of her jailors. Ullery v. Bradley, 949 F.3d 1282, 1297 (10th

Cir. 2020) (collecting cases from the Second, Third, Sixth, Seventh, Eighth, and Ninth Circuits);

see also Brown v. Flowers, 974 F.3d 1178, 1183 (10th Cir. 2020) (holding, in a case presenting

facts that directly parallel those here, that "nonconsensual, coerced sex" constitutes a violation of

a detainee's constitutional rights even where physical coercion is not necessarily present).

Accordingly, the court finds that Claims One and Two, which assert Plaintiff's rights under the

Eighth and Fourteenth Amendment, provide a proper basis for liability and relief under 42

U.S.C. § 1983.

Claim Three is also brought pursuant to 42 U.S.C. § 1983 but asserts that Defendant

violated Plaintiff's rights to Equal Protection under that provision of the Fourteenth Amendment

to the federal Constitution. While courts have held that that the Equal Protection Clause

establishes a right to be free from sexual harassment by public officials, those decisions have

largely been limited to the workplace and educational context. See, e.g., Sampson v. Cty. of Los

Angeles by & through Los Angeles Cty. Dep't of Child. & Fam. Servs., 974 F.3d 1012, 1024

(9th Cir. 2020) ("The right under the Equal Protection Clause to be free from sexual harassment

by public officials *in the workplace and school contexts* is clearly established by our prior case

law.") (emphasis added). Courts have sometimes spoken more broadly, for example, by

proclaiming that "[s]exual harassment by state actors violates the Fourteenth Amendment and

establishes a section 1983 action," Crutcher-Sanchez v. Cty. of Dakota, 687 F.3d 979, 985 (8th

Cir. 2012), but at least the Tenth Circuit has ruled that "[c]laims of sexual harassment and assault

of inmates by prison guards are more properly analyzed under the Eighth Amendment" and that

"[t]he Equal Protection Clause in the prison-conditions context is usually invoked to remedy disparities in educational, vocational, and recreational programs offered to male and female inmates." Barney v. Pulsipher, 143 F.3d 1299, 1312 n.15 (10th Cir. 1998); cf. Helling v. McKinney, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment"). Where, as here, the court concludes that Plaintiff's claims are adequately remedied under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment, the court will not unnecessarily tread new ground in formulating a framework for applying the Equal Protection analysis to these specific facts. See Chao v. Ballista, 772 F. Supp. 2d 337, 347 (D. Mass. 2011) ("Although Chao brought several constitutional claims, they are primarily 'bounded by the Eighth Amendment, the explicit textual source of constitutional protection in the prison context.'") (quoting Adkins v. Rodriguez, 59 F.3d 1034, 1037 (10th Cir. 1995)).

Claim Four alleges that Defendant is liable for Intentional Infliction of Emotional Distress ("IIED"). Under Massachusetts law, a claim for IIED requires proof "(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466, 681 N.E.2d 1189, 1197 (1997). The factual allegations, accepted as true, provide a proper basis for liability and relief under the IIED claim as Mr. Martinez, as a court

officer, should have known that emotional distress was a likely result of engaging in sexual

contact with a detainee in his custody. Likewise, coerced and unwanted sexual activity between a

court officer and a detainee in the court officer's custody is, by all accounts, extreme and

outrageous conduct that cannot be tolerated.

Claim Five asserts that Defendant is liable for Battery. To prove Battery, "[t]he act [of

the defendant] must cause, and must be intended to cause, an unpermitted contact." Waters v.

Blackshear, 412 Mass. 589, 590, 591 N.E.2d 184, 185 (1992) (quoting W.L. Prosser & W.P.

Keeton, Torts, § 9, at 41 (5th ed. 1984)). Here, Defendant's unwanted and unsolicited sexual

contact with Plaintiff plainly constitutes "unpermitted contact."

Claim Six asserts that Defendant is liable for False Imprisonment. The elements of a

False Imprisonment claim are: "(1) intentional and (2) unjustified (3) confinement of a person,

(4) directly or indirectly (5) of which the person confined is conscious or is harmed by such

confinement." Noel v. Town of Plymouth, 895 F. Supp. 346, 354 (D. Mass. 1995). "In

Massachusetts, a review of the cases reveals that the key factor in determining whether there has

been 'confinement' is whether the person is free to leave." Ball v. Wal-Mart, Inc., 102 F. Supp.

2d 44, 55 (D. Mass. 2000). Here, the admitted-to allegations establish liability for False

Imprisonment as Mr. Martinez acted intentionally, in keeping Ms. Perna in the locations where

he assaulted her, and unjustifiably, where the purpose of her detention was meant to serve the

purposes of the criminal justice system and not Mr. Martinez's personal pleasure. Mr. Martinez

also confined her by keeping her shackled and held in a location where he could assault her and

where she would not feel free to leave. Furthermore, Ms. Perna was both conscious of her

confinement and harmed by such confinement.

For the reasons set forth above, the court concludes that there is a valid basis for liability under 42 U.S.C. § 1983 and in tort. Accordingly, the court proceeds to consider the amount of damages to be awarded.

    III.    Legal Standard on Damages

Where, as here, the Complaint [#1] does not describe a "sum certain" for damages, "the plaintiff bears the burden of proof and must introduce evidence to establish the amount of damages with reasonable certainty." Fed. R. Civ. P. 55(b)(2); IDEXX Distribution Inc. v. Daniel A. Lauridia DVM PC, No. 2:19-CV-00412-LEW, 2020 WL 265194, at *1 (D. Me. Jan. 17, 2020) (citing Seifts v. Consumer Health Sols. LLC, 61 F. Supp. 3d 306, 316 (S.D.N.Y. 2014)); see also Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (noting that, in such cases, "[t]he district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty").

Damages are proven through an evidentiary hearing, or through affidavits and other documentary submissions that provide a factual basis for determining the amount of damages to be awarded. Rolls-Royce, 688 F. Supp. 2d at 155–56 (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)). Here, Plaintiff has opted to put forth evidence in the form of her testimony and documentary evidence. Defendant has elected to not put forth any evidence.

Although Plaintiff has established liability under both state common law and federal statutory law, the relief afforded is largely identical as both the common law and § 1983 "are designed to provide 'compensation for the injury caused to plaintiff by defendant's breach of duty.'" Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986) (quoting 2 F. Harper, F.

James, & O. Gray, <u>Law of Torts</u> § 25.1, p. 490 (2d ed. 1986)). Such compensatory damages may include not only out-of-pocket loss and other monetary harms, but also injuries such as "impairment of reputation . . . personal humiliation, and mental anguish and suffering." <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 350 (1974).

Compensatory damages are generally divided into two broad categories. "General Damages," also known as presumed damages, refer to those compensatory damages "for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is normally to be anticipated." Restatement (Second) of Torts § 904 (1979). "Special Damages," also known as proven damages, on the other hand, are "compensatory damages for a harm other than one for which general damages are given." <u>Id.</u> In cases involving harm to a person, "harm to earning capacity, expenses for medical treatment and similar items are ordinarily treated as bases for special damages." Restatement (Second) of Torts § 904 (1979); <u>see also</u> <u>Quinones-Pacheco v. Am. Airlines, Inc.</u>, 979 F.2d 1, 5 (1st Cir. 1992) (noting that special damages include "e.g., medical expenses or loss of earnings"); <u>but see</u> <u>Doherty v. Ruiz</u>, 302 Mass. 145, 147, 18 N.E.2d 542, 543 (1939) ("Impairment of earning capacity which is a natural result of disabling personal injury, is not special damage, and need not be pleaded as such.").

Beyond compensatory damages, punitive damages are available on Plaintiff's § 1983 claim if Defendant "acted with a malicious or evil intent or in callous disregard of the Plaintiff's federally protected rights." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).

IV.    <u>Evidence Offered as to Damages</u>

Plaintiff offered her own testimony and several exhibits to establish her damages. The court found Ms. Perna highly credible and credits her testimony in full. Mr. Martinez did not

11

offer any evidence but did suggest in argument that the sexual contact was consensual. The court ascertains the following facts relevant to the damages inquiry based on the testimony provided.

Ms. Perna, presently a 38-year-old single mother of a 13-year-old daughter, was raised primarily in foster care and group homes after being removed from her mother's custody at age nine. When she was 15 years old, she ran away and started living on her own. Ms. Perna started using drugs when she was very young and ever since she has battled addiction. Her struggles with addiction often put her in "risky" situations where Ms. Perna has been held against her will, beaten, tortured, and raped.

Ms. Perna described how, as a result of various arrests related to drug use, she had been brought to the Lawrence District Court over twenty times for court appearances. As a result, she had seen and had interacted with Mr. Martinez on several occasions. Ms. Perna acknowledged that the two had always been flirtatious with one another. She explained that by being "extra sweet" towards Mr. Martinez, she could curry his favor in the form of cigarettes, candy, or even meals. Ms. Perna also testified that on one visit to the courthouse when she was not in custody, Mr. Martinez gave her a piece of paper with his telephone number on it and asked her to stay around after the proceedings. Ms. Perna testified that she never called Mr. Martinez and never met with him.

Ms. Perna testified that the first assaults occurred in July 2009.[2] She described both the interaction in the elevator and in the cell in a manner consistent with the allegations deemed admitted in the complaint. She explained further how, during the interactions, she felt extremely

---

[2] The 2009 assaults are outside of the statute of limitations for this action. However, "[t]he fact that an event itself is not actionable does not automatically negate its evidentiary value." Rathbun v. Autozone, Inc., 361 F.3d 62, 76 (1st Cir. 2004). Here, although Ms. Perna cannot be compensated for any damages she suffered as a result of the 2009 assaults, they provide relevant background information.

uncomfortable and would try to do things that would subtly get Mr. Martinez to stop. For example, Ms. Perna asked about security cameras that might record the interactions and also tried to pull away from Mr. Martinez. She explained that she only took subtle steps to attempt to stop the assault because of the power Mr. Martinez wielded over her and because she had learned through other experiences "that you don't fight because sometimes it can make things worse."

Ms. Perna testified that, following the 2009 assaults, she reported the assault to a counselor and a coordinator employed by the Strafford House of Corrections. In its Answer ¶ 9 [#70], Defendant Strafford House of Corrections admitted that Plaintiff made these reports to County employees and that Strafford County employees shared the reports with the New Hampshire Department of Corrections. Plaintiff also introduced into evidence a memorandum written in November 2009 by a member of the Strafford County Department of Corrections detailing Plaintiff's account of events in a manner consistent with her testimony and the facts alleged in the Complaint.

Ms. Perna also testified credibly as to assaults that occurred on two different dates in September 2014 and October 2014. Again, she described the assaults in a manner consistent with the allegations already deemed admitted. Ms. Perna also explained how the September 2014 incident had been the first time she saw Mr. Martinez since the July 2009 assaults. She described how Mr. Martinez brought candy over to her while she was in the cell and that he then proceeded to grope her through the cell door when handing her the candy. Ms. Perna described how she did not want to be touched, but that she "froze" when he touched her and did not know what to do. She also described how, later that same day in September 2014, when another officer was about to bring Ms. Perna to the courtroom in the courthouse elevator, Mr. Martinez volunteered to bring her to court himself. Ms. Perna testified that, with the two of them alone together in the

elevator, Mr. Martinez used a key to stop the elevator and proceeded to compliment Ms. Perna

on her appearance before proceeding to kiss and grope her on top of and underneath her clothing.

Ms. Perna further explained that when Mr. Martinez attempted to have intercourse with her, she

tried to subtly resist by holding her legs together, feigning that her legs were bound more closely

together by the shackles than they actually were. Ms. Perna also stated that Mr. Martinez took a

picture of her while she was partly undressed. She explained that, while this was happening, she

felt scared, afraid, and a sense of just wanting it "over with and done." She also described a sense

of feeling trapped and helpless since there was nothing that she could do to stop the assault from

happening.

Ms. Perna testified that in October 2014 she was again arrested and brought to the

Lawrence District Court. She further testified that she was, as was typical, placed in a holding

cell awaiting her court appearance. At some point, Mr. Martinez appeared and removed her from

the cell. Ms. Perna explained how she expected Mr. Martinez to bring her to the courtroom, but

that Mr. Martinez led her in the opposite direction, guiding her with his hand placed on the small

of her back. Ms. Perna testified that when she began to realize that Mr. Martinez was leading her

someplace different than usual, she began to feel apprehensive, afraid, and cognizant that she

was not in a "safe place." She described how Mr. Martinez ultimately brought her to a dimly lit

utility room. In the room, Mr. Martinez complimented her on her physical appearance and began

to kiss and grope her. Ms. Perna further testified that, unlike the previous instance, Mr. Martinez

first removed one of her leg shackles before attempting to have sex with her. Ms. Perna testified

that Mr. Martinez entered her with his penis and ejaculated inside of her. Ms. Perna explained

that, while this was happening, she felt empty and afraid and that she did not know what to do as

14

there was no one around to help. Ms. Perna testified that, as before, her strategy was to try to just get it over with.

Throughout Ms. Perna's testimony, she acknowledged that she never fought back nor did she explicitly object to Mr. Martinez's sexual advances. As detailed above, she explained that she tried to provide subtle hints that she was uninterested in having any sexual contact with Mr. Martinez; however, there is no evidence that Mr. Martinez registered her actions as protests.

Ms. Perna also described the long-term effects that the assaults had on her. She testified that, since the attacks, and especially following the 2014 attacks, she has suffered from increased anxiety, panic attacks, nightmares, and difficulty sleeping. She explained that the chronic anxiety and panic attacks are often triggered by events that cause her to relive the assaults.

Mr. Martinez was prosecuted for rape and Ms. Perna testified at his trial. As her medical records extensively corroborate, the criminal trial was difficult for Ms. Perna. She recounted that Mr. Martinez's defense at the two-week trial was that any sexual interactions between the two of them were consensual and that Mr. Martinez was eventually acquitted of the charges of rape and sexual assault on that basis. Ms. Perna explained how her anxiety became so bad immediately before and after the trial that she started suffering from suicidal thoughts. She further explained that she had to choose between experiencing the suicidal ideation or drug use to "numb" her mind. Ultimately, Ms. Perna sought and received in-person psychiatric care both before the trial and after the trial concluded.

Ms. Perna testified that the attacks have degraded her sense of autonomy and a sense of trust that she held in public institutions. As previously noted, she acknowledged that she had a long history of drug abuse and that her addiction had often contributed to her making decisions that placed her into very dangerous situations. This included instances where she was held

against her will, physically and emotionally abused, raped, and even tortured. Ms. Perna explained that she always had a sense that any harm that resulted from these poor decisions was a consequence of choices that *she* had made, and she took, wrongly or rightly, a certain amount of responsibility over her choices and the consequences that followed. She explained further that she had believed that she would be in a safe place when she was in custody, protected from others and her own poor choices. Ms. Perna testified that Mr. Martinez's actions took away that possibility of safety. As a result, she was left with feelings of personal helplessness and with a sense that no one with the power and responsibility to stop her from being harmed would do so.

Things have somewhat improved for Ms. Perna from their nadir in 2017. She has had commendable success staying sober and out of prison. However, Ms. Perna continues to suffer from heightened anxiety and a susceptibility to triggers that cause her to relive her trauma. Perhaps more detrimentally, Ms. Perna continues to suffer from a sense of helplessness and difficulty trusting those around her. She testified how the assaults continue to undermine her sense of self-worth as she is often left thinking that "if something were to happen to me, it doesn't matter."

V.   Reasonably Ascertainable Damages

Plaintiff's Motion for Entry of Default Judgment [#123] requests compensation in the form of (1) general damages; (2) special damages comprising lost past wages, lost future earning capacity, and medical expenses; and (3) punitive damages. These three categories are discussed in turn.

1.   *General Damages*

Plaintiff requests $150,000 in general damages: $75,000 for the September 2014 assaults and $75,000 for the October 2014 assault.

Putting a dollar value on non-economic damages presents a particularly challenging task. Simply put, "there is no scientific formula or measuring device which can be applied to place a precise dollar value on" concepts such as pain and suffering. Limone v. United States, 579 F.3d 79, 105 (1st Cir. 2009) (quoting Wagenmann v. Adams, 829 F.2d 196, 216 (1st Cir. 1987)). Nonetheless, "the court must use 'a process of rational appraisal' based upon 'the evidence adduced at trial.'" Litif v. United States, 682 F. Supp. 2d 60, 82 (D. Mass. 2010), aff'd, 670 F.3d 39 (1st Cir. 2012) (quoting Ruiz v. Gonzalez Caraballo, 929 F.2d 31, 35 (1st Cir.1991)).

Mr. Martinez has not contested any of Plaintiff's damages. Indeed, Mr. Martinez's only defense to the Motion for Default Judgment has been his assertion that any sexual interactions with Ms. Perna were "consensual." But this defense is no defense at all. It bears emphasis and repeating that Ms. Perna was never in a position to fight back or resist Mr. Martinez's advances since she was in his custody. And where Ms. Perna did not have the power to say "No," the fact she did not say "No" is meaningless. For this reason, "[t]he law presumes that a prisoner cannot consent to sexual relations with her keepers, and punishes such conduct criminally." Chao, 630 F.Supp.2d at 173 (citing Mass. Gen. Laws ch. 268, § 21A). That Mr. Martinez served as a court officer rather than a correctional officer may have allowed him to avoid prosecution under that statute, but the question of consent for sex in an incarcerative environment remains a logical fallacy.

Accordingly, the evidence offered by Plaintiff readily supports her requested award of $150,000 in general damages. It is deemed admitted that, on three instances within the statutes of limitation for this action, Mr. Martinez sexually assaulted Ms. Perna by subjecting her to unwanted sexual contact, including, on the last occasion, intercourse. As set forth above, Ms. Perna testified as to how Mr. Martinez's actions not only caused her mental anguish and

suffering at the time of the attacks, but as to how they continue to affect her and degrade her quality of life. This testimony was credible and credited in full. Given the violative nature of the assaults and their natural proclivity for causing Ms. Perna long-lasting mental anguish and suffering, the requested $150,000 is fair and reasonable compensation considering the evidence submitted.[3]

       2. *Special Damages*

Plaintiff also requests an award of special damages comprising $146,650 in lost past wages; $884,000 in lost future earning capacity; and $53,521.45 in medical expenses. While the court concludes that Plaintiff has established entitlement to compensation for her medical expenses, Plaintiff's proof on lost past wages and future earning capacity was insufficient.

Starting with lost past wages, Plaintiff provided no evidence establishing that any disability that she suffered as a result of the assaults contributed to Plaintiff not earning wages that she otherwise would have earned. Ms. Perna's only testimony as to previous employment was that she has, in the past, mostly worked part-time jobs such as waitressing and bartending. However, neither her testimony nor exhibits established any correspondence between the attacks and a reduction in her earnings, much less a causal relationship between the two.

Plaintiff's evidence as to lost earning capacity was similarly deficient. As the First Circuit has stated, "[i]n tort actions, loss of earning capacity is an economic concept based upon *a*

---

[3] The requested award is also well-within compensation awarded by other courts in comparable cases. In Noonan v. Becker, a Magistrate Judge of the Southern District of New York performed an assessment of cases of assault or rape involving law enforcement defendants. See No. 14-CV-4084-LTS-JLC, 2018 WL 1738746, at *6 (S.D.N.Y. Apr. 10, 2018), report and recommendation adopted, No. 14 CV 4084-LTS-JLC, 2018 WL 2088279 (S.D.N.Y. May 3, 2018). The court found that many assault or rape cases involving law enforcement defendants awarded compensatory damages in the range of $250,000–$500,000. Id. at 6–7. However, the court also found that these amounts may be "unduly low" relative to cases involving rapes and assaults by private individuals. Id. at 7.

*medical foundation.*" Quinones-Pacheco, 979 F.2d at 6 (emphasis added). Accordingly, to establish lost earning capacity, plaintiffs must put forth evidence establishing how a proven disability has affected their forecasted future earnings. Id. Here, Plaintiff has provided some testimony that she could be expected to earn wages consistent with part-time work in the service industry, but she has not established a disability that would interfere with her ability to perform that work. Accordingly, the court cannot award compensation for lost earning capacity.

Finally, there is Plaintiff's request for medical expenses related to in-patient psychiatric care that she received both immediately before and after testifying at Defendant's criminal trial. Ms. Perna's testimony, which is thoroughly corroborated by the contemporaneous medical records, demonstrates that Mr. Martinez's assaults were the legal and proximate causes for her need for in-person psychiatric care in March and April 2017. At the evidentiary hearing, Mr. Martinez implied that any medical treatment that Ms. Perna required was not the result of his actions but, instead, Plaintiff's underlying medical history. However, under the long-standing "eggshell plaintiff rule" Mr. Martinez is liable for the full extent to which he worsened Plaintiff's mental health. See Figueroa–Torres v. Toledo–Davila, 232 F.3d 270, 275 (1st Cir. 2000) ("The defendant of course is liable only for the extent to which the defendant's conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was; but as to the aggravation, foreseeability is not a factor.") (quoting W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 43 at 291 (5th ed. 1984))). Here, that aggravation includes the costs associated with the psychiatric care Ms. Perna received in March and April 2017. Thus, Plaintiff is awarded $53,521.45 in out-of-pocket medical expenses.

### 3. Punitive Damages

The final category of damages available to Plaintiff are punitive damages on Plaintiff's § 1983 claim. As the Supreme Court explained in <u>Smith v. Wade</u> when it adopted the common-law rule for assessing punitive damages, punitive damages should be awarded in the discretion of the factfinder "'to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future.'" 461 U.S. at 54 (quoting Restatement (Second) of Torts § 908(1) (1977)). "Although the specific intent to violate a plaintiff's federally protected right will support a punitive damages award, 'reckless indifference' towards a plaintiff's federally protected right also suffices to authorize liability for punitive damages under § 1983." <u>Powell v. Alexander</u>, 391 F.3d 1, 19 (1st Cir. 2004).

The court finds that the standard for punitive damages is met here. When Mr. Martinez proceeded to kiss, grope, and have intercourse with Ms. Perna, he, *at best*, acted with callous indifference to Ms. Perna's circumstances and the absolute power that he held over Ms. Perna as her captor. Mr. Martinez knew or should have known that he was taking advantage of the power he wielded over Plaintiff to use her for his own sexual gratification. In doing so, Mr. Martinez "engaged in a course of behavior" that this court finds to be "outrageous and worthy of condemnation." <u>Zimmerman v. Direct Federal Credit Union</u>, 262 F.3d 70, 84 (1st Cir. 2001).

Beyond the direct consequences of his actions on Ms. Perna, the court finds Mr. Martinez's actions particularly reprehensible given the position of trust he held when he assaulted her. Mr. Martinez, as an officer of the Lawrence District Court, was entrusted by the Judges of that court with the solemn responsibility of caring for individuals whose liberty had been taken away from them. Where Mr. Martinez instead viewed an individual entrusted to his custody as an object for his sexual gratification, his abuse of the Judges' trust is unconscionable.

Finally, Mr. Martinez's lack of contrition weighs heavily in determining the appropriate amount of punitive damages. Seven years after the fact—with no dispute that he indeed had sex with a detainee in his custody—Mr. Martinez continues to not appreciate the wrongfulness of his conduct, the effect of his actions on Ms. Perna, and how his actions undermine the public trust in our institutions. The manifest lack of contrition weighs heavily on the court and leads the court to find that anything less than a serious punitive damages award would effectively send a message that Mr. Martinez's conduct is tolerable so long as the victim is compensated. Because the court finds that Mr. Martinez's conduct can have no place in our society, the court finds that punitive damages are appropriate, and necessary. Punitive damages are awarded in the amount of $500,000.

### 4. Settlement Offset

Ms. Perna has already settled claims against Defendant Strafford County House of Corrections, for $75,000. See Pl.'s Mot. Entry Default Judgment ¶ 7 [#123]. The existence of this settlement presents the question of whether Strafford County's contribution should affect any judgment entered against Mr. Martinez. "It is generally agreed that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement." McDermott Inc. v. AmClyde, 511 U.S. 202, 208 (1994).

Courts have noted, however, that the offset (sometimes called set-off) rule exists to prevent the risk of double recovery by plaintiffs and that the "non-settling defendant bears the burden . . . of establishing the extent to which a recovery against it would be duplicative of the plaintiff's recovery from the settling defendants." RLI Ins. Co. v. King Sha Grp., 598 F. Supp. 2d 438, 447 (S.D.N.Y. 2009). Thus, where the nonsettling defendant has defaulted, some courts have held that the "defaulting party eschews the opportunity to carry this burden, and therefore

does not demonstrate its entitlement to, or deserve the benefit of, a set-off." State Farm Mut. Auto. Ins. Co. v. Grafman, 968 F. Supp. 2d 480, 483–84 (E.D.N.Y. 2013). However, other courts have allowed an offset to the benefit of a defaulting defendant where the court found, for example, that an offset was required to avoid an excessive award, see Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co. Inc., 2012 WL 1414872, at *9 (E.D.N.Y., Jan. 20, 2012), or where the plaintiff agreed to a setoff, see State Farm Mutual Automobile Insurance Co. v. Kalika, 2007 WL 4326920, at *9 (E.D.N.Y., Dec. 7, 2007); see also City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-03966 CBA JMA, 2013 WL 5502954, at *3 (E.D.N.Y. Oct. 1, 2013) (noting that some courts have adopted a "bright-line rule" that defaulting defendants may not benefit from an offset where other courts have "given a defaulting defendant the benefit of a settlement set-off where warranted based on the circumstances of the case"). The court has identified no First Circuit precedent on the question.

Here, the court does not need to resolve whether it should adopt a bright-line rule that a defaulting party may not benefit from an offset since the court finds that the specific circumstances of this case do not support the application of an offset for any amounts paid by Strafford County. As an initial matter, although the court flagged the issue of a potential need for an offset before Plaintiff filed her motion for an entry of a default judgment, Mr. Martinez has not addressed the issue by putting forth any argument as to why he should benefit from a credit. In addition, Plaintiff's relatively modest recovery from Strafford County House of Corrections must be measured against Plaintiff's cost of bringing the litigation against Strafford County, including extensive motion practice and the costs of settlement negotiations. Where the offset rule exists to prevent double recovery and Plaintiff's recovery from Strafford County may have gone entirely towards her attorney's fees, application of the offset rule here may not prevent a

double recovery so much as constitute a windfall for the defaulting Defendant. Accordingly, the court will enter a default judgment against Mr. Martinez in the full amount of damages.

VI.    <u>Conclusion</u>

For the reasons set forth above, Plaintiff Mariann Perna's <u>Motion for Entry of Default Judgment</u> [#123] is GRANTED IN PART. The court finds that Plaintiff is entitled to reasonably ascertainable compensatory damages in the amount of $203,521.45. This reflects $150,000 in general damages and $53,521.45 in medical expenses. In addition, for the reasons set forth above, the court finds that Mr. Martinez is subject to $500,000 in punitive damages, for a total liability of $703,521.45. Judgment to follow.

IT IS SO ORDERED.

Date: March 31, 2021

/s/ Indira Talwani
United States District Judge